1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   J.R., a minor, by and through
     his parents W.R. and N.R.,
11   and W.R. and N.R., individually,

12            Plaintiffs,                    No. CIV S-06-2136 LKK GGH PS

              vs.
13
     SYLVAN UNION SCHOOL DISTRICT,
14   STATE OF CALIFORNIA DEPARTMENT
     OF EDUCATION in its supervisory
15   capacity, the CALIFORNIA OFFICE          FINDINGS AND RECOMMENDATIONS
     OF ADMINISTRATIVE HEARINGS, and
16   DR. JOHN HALVERSON, in his
     official capacity as superintendent
17   for SYLVAN UNION SCHOOL DISTRICT,

18            Defendants.

19   _____/

20            Previously pending on this court's law and motion calendar for August 9, 2007,

21   were the following motions to dismiss: (1) filed November 30, 2006 by the California

22   Department of Education ("CDE" or "Department"); (2) filed November 30, 2006, and renoticed

23   June 22, 2007, by Sylvan Union School District ("SUSD" or "District") and Superintendent Dr.

24   John Halverson; and (3) filed December 1, 2006 by the California Office of Administrative

25   Hearings, Special Education Division ("OAH").  These motions challenge the allegations of

26   plaintiffs' complaint filed September 27, 2006, that the District's recommended educational

1

1  placement of their minor son, "J.R.," who is autistic, violates the Individuals with Disabilities

2  Education Improvement Act ( "IDEIA"),[1] 20 U.S.C. § 1400 et seq.

3            Initially noticed before the District Judge, defendants' motions were referred to

4  the undersigned on April 7, 2007, following the withdrawal of plaintiffs' counsel.  E. D. Cal. L.

5  R. 72-302(c)(21) and 28 U.S.C. § 636(b)(1).

6            On April 24, 2007, this court stayed these proceedings pending the U.S. Supreme

7  Court's decision in Winkelman v. Parma City School District, 127 S.Ct. 1994 (2007).  In its

8  decision filed May 21, 2007, the Supreme Court held that the Individuals with Disabilities

9  Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., grants parents independent and enforceable

10  rights they may litigate *pro se* in federal court.[2]  Since these rights are coterminous with the rights

11  of the child, the Court found it unnecessary to reach the question whether IDEA entitles parents

12  to litigate their child's claims in *pro se.*  Id.

13            Accordingly, Winkelman enables plaintiff parents herein to pursue their IDEA

14  claims without counsel.  However, Winkelman does not accord these parents the right to pursue

15  non-IDEA claims on behalf of J.R. because the general rule remains that "a parent or guardian

16  cannot bring an action on behalf of a minor child without retaining a lawyer," Johns v. County of

17  

18            [1] Originally enacted as the "Education for All Handicapped Children Act of 1975," Pub.
L. No. 91-142, 89 Stat. 773 (1975), this legislation was, in 1997, significantly amended to its

19  current form and renamed the Individuals with Disabilities Education Act ("IDEA"), Pub.L. No.
105-17, 111 Stat. 37 (1997), 20 U.S.C. § 1400 et seq.  The IDEA was reauthorized in 2004 as the

20  Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub. L. No. 108-
446, 118 Stat. 2647 (2004).

21  

22            [2] Although Winkelman construed parents' pro se representation rights pursuant to the
IDEA, there are no significant distinctions between the IDEA and IDEIA with respect to the issue

23  of pro se representation or, for that matter, the other issues presented in the instant case.  Cf., e.g.,
n. 13, infra (IDEIA places greater emphasis than did IDEA on post-secondary education and

24  independent living skills); Brennan v. Regional School Dist. No. Bd. of Education, ____ F. Supp.
____, 2008 WL 220751, *30, n. 7 and related text (D. Conn. 2008) (IDEIA, unlike IDEA, sets

25  forth federal time limits for taking an appeal).  Accordingly, the instant case relies equally upon
cases construing both the IDEA and IDEIA (and many cases appear to use the acronyms

26  interchangeably), but refers generally to 20 U.S.C. § 1400 et seq., as the "IDEIA," unless
otherwise specified.

1   San Diego, 114 F.3d 874, 877 (9th Cir. 1997) (where minors "have claims that require

2   adjudication, they are entitled to trained legal assistance so their rights may be fully protected");

3   see also, Jie Lin v. Ashcroft, 377 F.3d 1014, 1025 (9th Cir. 2004).  Only where the rights of the

4   child and parents are coterminous can the parents pursue, on their own behalf, the claims they

5   share with their child.

6           Subsequent to the Winkelman decision, and following this court's submission of

7   these matters following a hearing on August 9, 2007, attorney Scottlynn J. Hubbard submitted a

8   letter stating he would be undertaking representation of J.R. but would defer his decision whether

9   to represent J.R.'s parents.  However, Mr. Hubbard did not file a substitution of counsel or make

10  further communication to the court.  On December 18, 2007, the court issued an order directing

11  plaintiffs to inform the court of the status of Mr. Hubbard's representation, noting that plaintiffs'

12  representation had been a significant issue throughout this action, both administratively and

13  before this court.[3]  In a letter dated January 9, 2008, Mr. Hubbard informed the court that he

14  would not be undertaking representation of either J.R. or his parents.

15          Accordingly, the court now issues these findings and recommendations.

16  I.  JUDICIAL NOTICE

17          The court takes judicial notice of the following documents pursuant to Fed. R.

18  Evid. 201 (authorizing judicial notice of adjudicative facts "capable of accurate and ready

19  determination by resort to sources whose accuracy cannot reasonably be questioned"):  (1) the

20  June 29, 2006 administrative decision issued in this case by Administrative Law Judge Deidre L.

21  Johnson, Office of Administrative Hearings, Special Education Division, Case No.

22  N2006030058 (Exhibit 4 to plaintiff's Motion for Temporary Restraining Order ("TRO Motion")

23

24          [3]  The request of plaintiffs' prior counsel to withdraw their representation, filed December
    4, 2006, was granted by the District Judge on February 6, 2007.  Plaintiffs were given thirty days
25  within which to retain new counsel or inform the court of their intent to proceed in pro se.
    Plaintiffs were still pro se on April 4, 2007, when the District Judge referred the case to the
26  undersigned.

filed September 29, 2006 (Docket No. 6), and Exhibit A to the District's November 30, 2006

request for judicial notice (Docket No. 46)); (2) the July 20, 2006 Order Setting Telephonic

Administrative Conference (Exhibit 6 to TRO Motion (Docket No. 6)); (3) the administrative

hearing transcripts filed by plaintiff on December 1, 2006) (Docket No. 50) and January 30, 2007

(Docket No. 65); (4) the August 31, 2006 administrative "Order re Respondent's Request for

Transcript" (Exhibit 7 to TRO Motion (Docket No. 6)); and (5) several unpublished decisions by

U.S. District Courts on issues similar to those presented in this case and submitted by the parties

(exhibits to the District's Appendix filed December 1, 2006 (Docket No. 48), OAH's Reply filed

July 27, 2007 (Docket No. 81), and the District's Supplemental Authority filed October 16, 2007

(Docket No. 87)).

II. <u>BACKGROUND</u>

      Plaintiffs challenge the June 29, 2006 decision of ALJ Johnson upholding and

authorizing implementation of the District's individualized education plan ("IEP") proposed

January 31, 2006 for J.R.  The IEP proposes changing J.R.'s primary placement from "full

inclusion" in a regular classroom to a special needs classroom.  The administrative law judge

approved the IEP based on her findings it would meet the statutory requirements of providing "a

free appropriate public education" in the "least restrictive environment." 20 U.S.C. § 1412.

Admin. Decision, at p. 19.  (The decision also authorized the District to conduct an occupational

therapy reassessment of J.R., but plaintiffs do not challenge this finding.)

      Plaintiffs timely filed this civil action challenging the substance of the

administrative decision and asserting procedural violations of the Act.  20 U.S.C. § 1415(i)(2).

Plaintiffs contend that J.R.'s placement in a learning handicapped/special day class ("LH/SDC")

would deny him a fair appropriate public education ("FAPE") in the least restrictive environment

("LRE"); plaintiffs also assert the denial of their requests to continue the due process hearing

rendered them unable to retain legal counsel and to present evidence at the hearing, and that the

inability of the Office of Administrative Hearings ("OAH") to provide a complete transcript of

4

1   the hearing (only a brief portion of the third day of hearing was recorded) impedes their appeals

2   rights before this court.  Plaintiffs assert the alleged procedural violations in their case reflect

3   systemic procedural violations by OAH.

4        Plaintiffs' request for a temporary restraining order was denied by the District

5   Judge on October 11, 2006, and again upon reconsideration on November 27, 2006.  Pursuant to

6   statute, J.R.'s current educational placement remains a full inclusion classroom.  20 U.S.C. §

7   1415(j).

8   A. PRELIMINARY FACTS

9        J.R., born January 15, 1999, receives special education services within the Sylvan

10  Union School District pursuant to the IDEIA, 20 U.S.C. § 1400 et seq., California Education

11  Code § 56000 et seq., and implementing regulations 34 C.F.R. § 300.1 et seq., and 5 C.C.R. §

12  4600 et seq., respectively.

13       In April 2000, J.R. was deemed eligible for early intervention (preschool)

14  services.  Between February 2002 and July 2004, he received 35 to 40 hours services per week,

15  known as Applied Behavior Analysis ("ABA") and Discrete Trial Training ("DTT").  These

16  services were provided by Applied Behavior Consultants, Inc. ("ABC"), a nonpublic agency

17  ("NPA"), funded by defendant Sylvan Union School District and Valley Mountain Regional

18  Center.  The services were rendered pursuant to an Early Intervention Behavior Treatment

19  ("EIBT") agreement, also known as a "Four Way Agreement" because based upon a contract

20  entered into by the school district, the regional center, the non-public agency, and the parents.

21       In May 2004, the District recommended that J.R. be transitioned to kindergarten

22  by fading out his ABA/DTT program and placing him in a special day class for the learning

23  handicapped with an aide provided by SUSD.  This recommendation was made formally at an

24  IEP meeting held July 2, 2004.  The complaint provides (at ¶¶ 17, 18):  "The reason the IEP team

25  made the recommendation to fade the ABC program was due to J.R. not meeting the EIBT

26  criteria, even though he was continuing to make steady progress on his goals under the program."

1       "Another IEP meeting was held on July 16, 2004 to continue the discussion from

2   the July 2, 2004 meeting. With input from N.R. and W.R., the IEP team decided to continue []

3   J.R.'s ABA/DTT program through ABC which would be provided at both school and home. The

4   IEP team also recommended that J.R. be fully included with his typically developing peers in a

5   kindergarten class at Freedom Elementary School with the supports and services to be provided

6   by ABC.  Parents signed the July 16, 2004 IEP."  Complaint, ¶ 19.

7       During the 2004-2005 school year, J.R. was enrolled in a general education

8   kindergarten class.  He continued to receive 35 to 40 hours ABC support services weekly, both at

9   school and at home.  Id. at ¶ 20.  IEP meetings were held periodically throughout the school year,

10  wherein the District continued to recommend placing J.R. in a special day class and parents

11  continued to request that J.R. maintain his current placement and support services.  In February

12  2005, the IEP team added "pull out" ABC resources to assist J.R. in meeting classroom goals.

13  Id. at ¶¶ 22-24.

14      The last agreed upon IEP was March 16, 2005.  Notice of Request for Due

15  Process Hearing, Administrative Record ("AR"), at p. 2).  At the June 10, 2005 IEP meeting, the

16  District recommended J.R. be placed in a LH/SDC class with related support services.  Id. at 3.

17  Parents' advocate, Marilyn Maggio, responded in a letter dated June 22, 2005, "outlining the

18  services and supports the parents believed to be required for J.R. to continue to receive a free and

19  appropriate public education . . ." Complaint, ¶ 25.

20      In July 2005, SUSD, through its attorney, Elizabeth Estes, responded to Ms.

21  Maggio's letter "with the same offer of the learning handicapped special day class with a 1:1

22  SUSD aide, speech and occupational therapy services and a plan to systematically fade out the

23  ABC services."  Id. at ¶ 26.  Plaintiffs did not respond.  AR at 4.  Pursuant to a letter written

24  between April 2005 and February 2006, parents sought the assistance of SUSD Superintendent

25  Dr. John Halverson in resolving these issues but such assistance was not forthcoming.  Id. at ¶

26  32.

1    J.R. commenced the 2005-2006 school year with the same arrangements provided

2  during the 2004-2005 school year, in a general educational kindergarten class. Id. at ¶¶ 27, 31.

3  On September 7, 2005, the District "filed a due process complaint with the Office of

4  Administrative Hearings to initiate the change of placement that the District had been advocating

5  for." Id. at ¶ 28. "Parents retained Rick Ruderman as legal counsel on or about October 14,

6  2005. Mr. Ruderman filed a motion to dismiss due to improper service on parents and notice of

7  insufficiency. The Office of Administrative Hearings dismissed the complaint due to the service

8  of process issue." Id. at ¶ 29. "Due to complaint being dismissed, parents believed that they no

9  longer required legal assistance and due to the financial hardship the legal services imposed, they

10 decided to terminate their relationship with Mr. Ruderman." Id. at ¶ 30.

11   The next IEP meeting was scheduled for December 9, 2005 but cancelled at

12 plaintiffs' request to provide for additional assessments. AR at 4. "[O]n December 9, 2005, the

13 District proposed several assessments for [J.R.] in order to complete his triennial evaluation.

14 [J.R.'s] parents never responded to the assessment plan, nor have they to date permitted the

15 District to complete the necessary assessments. The District later offered several dates in January

16 to reschedule[] that had been canceled and the meeting was finally held January 31, 2006." Ibid.

17   At the January 31, 2006 meeting, all members of the IEP team with the exception

18 of J.R.'s parents (and their advocate, Ms. Maggio), agreed upon the following recommendations

19 (AR at 4, 436-437):

20     - Placement in special day class for learning handicapped students (LH/SDC)
       - A 1:1 aide up to 6 hours per day at school
21     - Fading out of NPA home program to be replaced with autism inclusion services
       - Speech and language therapy three times a week for a total of 30 minutes
22     - Occupational therapy one time a week for a total of 30 minutes

23 J.R.'s parents refused to sign the January 2006 IEP. Complaint, ¶ 34; AR at 5.

24   B. ADMINISTRATIVE PROCEEDINGS

25     On March 1, 2006, the District, through its attorney, Sarah Daniel, filed A Notice

26 of Request for Due Process Hearing pursuant to 20 U.S.C. § 1415(f). AR at 2-10. The Notice

provided that plaintiffs last agreed upon an IEP on March 16, 2005, and that the District sought

implementation of the proposed January 31, 2006 IEP and further assessment of J.R., without

parental consent.

On March 2, 2006, the OAH notified the parties of the scheduling of mediation

and a due process hearing.  AR at 14-16.  Continuances of the OAH dates were granted until

early June 2006, pursuant to requests by both the District and plaintiffs, the latter based upon

their efforts to retain counsel.  In June, plaintiffs retained counsel Elizabeth Aaronson contingent

upon moving the hearing dates, but her motions for continuance were denied in prehearing

conferences held June 6 and 9, 2006.  See generally Prehearing Transcripts (Docket No. 65) and

discussion, infra.  Ms. Aaronson withdrew her tentative representation before commencement of

the due process hearing and parents thereafter proceeded in pro se.  Id.; Complaint, ¶ 37.

The complaint alleges that "OAH's denial of Ms. Aaronson's requests for

continuance left parents without other options.  With no other choice, N.R and W.R. substituted

in as the representatives for J.R.  N.R. and W.R. do not have any legal training.  N.R. is a nurse

and W.R. is a mechanic.  Although N.R. and W.R. attempted to prepare for the upcoming

hearing, they were lost in the legal process and did not know the steps to take to prepare for

hearing.  This caused parents extreme stress and took a toll on N.R.'s health and caused W.R. to

miss days from work."  Complaint, ¶¶ 38, 39.

The due process hearing was held on June 12, 13 and 14, 2006.  At the

commencement of the hearing, plaintiffs informed the ALJ they were unprepared and had been

unable to comply with the requirement they provide a prehearing statement identifying their

witnesses and exhibits.  See Transcript of Due Process Hearing, Vol. 1 ("TR (Vol. 1)"), at pp. 6-

8, 14-20.  Plaintiffs' motion for further continuance was denied.  Id. at 20.  The ALJ made an

effort, first suggested at the prehearing conference, to craft a month-long continuance for the sole

purpose of permitting plaintiffs additional time to obtain the reports of their independent

evaluators.  See, e.g., June 9, 2006 Prehearing Transcript, at pp. 19, 27, 41; TR (Vol. 1), at p.

261.  Plaintiffs waived this opportunity because they believed it impossible to obtain the

assistance of counsel within this period, but final resolution of this matter was to be discussed at

the conclusion of the third day of hearing.  See, e.g., TR (Vol. 2), at pp. 261-266.

The first day of hearing was terminated shortly after it began due to the

emergency medical needs of J.R.'s mother, later determined to be associated with stress.  The

attorney for the District gave her opening statement, as did J.R.'s mother, but no witnesses

testified.

On the second day of hearing, the following witnesses testified on behalf of the

District:  Melanie Sluggett, J.R.'s regular classroom teacher; Miriam Bermann, J.R.'s

occupational therapist; John Bettencourt, a special day class teacher for the learning handicapped

without firsthand knowledge of J.R. (AR at 196); and Cinnamon Simpson, a behavior analyst,

also without firsthand knowledge of J.R. (id. at 232).  J.R.'s mother questioned Ms. Sluggett, but

no other witnesses.

On the third day of hearing, the following witnesses testified:  James Merchant, a

school psychologist who tested J.R. but had not previously worked with him; Dr. Bonnie Santos,

the District Special Education Director involved in this case for several years; and Donovan

Chapa, J.R.'s ABC consultant for the past several years.  There is no audio recording or transcript

of these individuals' testimony with the exception of Mr. Merchant's introductory remarks

limited to his qualifications.  See August 31, 2006 "Order re Respondent's Request for

Transcript" (hereafter "Order re. Transcript"), at p. 3.

"Parents attended without representation and did not participate in any of the

proceedings except for offering an opening statement and a brief cross-examination of Plaintiff's

general education teacher.  Throughout the Hearing, Plaintiffs repeatedly asserted to the ALJ that

they did not know what was going on and that they could not represent themselves."  Complaint,

¶¶ 40, 41.  Parents assert that "the ALJ inappropriately berated parents on the third day of the

Hearing.  Additionally, in her findings, she states that because parents' other child also has a

disability, parents really did know what was going on in the case, insinuating that parents could

have represented themselves."[4]  Id. at ¶ 41.

In her decision issued June 29, 2006, the ALJ upheld the District's January 2006

IEP based on her findings it offered J.R. a free appropriate public education in the least

restrictive environment.[5]  The ALJ authorized the District to implement its January 2006 IEP

over plaintiffs' objections, subject to an appropriate transition from the general education

classroom to the special day class.  The ALJ also authorized the District, pursuant to the triennial

assessment plan of January 2006, to conduct an occupational therapy reassessment of J.R., but

---

[4]  J.R. has an autistic sibling three years older who also received ABC services.  Decision, at p. 5.  The ALJ found that "[t]he involvement of Parents in special education over many years tends to undermine their assertion that they do not understand what is going on in this case."  Admin. Decision, at p. 5, n. 3.

[5]  The administrative law judge reasoned that the new placement would accord J.R. a fair appropriate public education ("FAPE") because it would meet his needs for "a structured environment with a dense student-teacher ratio[], small group instruction, opportunities to practice skills by multiple repetitions without worrying about falling behind the pace of the class, frequent reinforcement and opportunities for reinforcers, without being segregated from other pupils, a flexible academic and functional education program to address his deficits, [and] . . . a class-wide behavior management system that [he] can be part of , without being pulled out of class or specially targeted."  Admin. Decision, at 17.

The administrative law judge further reasoned that placement of J.R. in a LH/SDC would provide the least restrictive alternative ("LRE") based on the following (id. at 17-18):

Student has not received much academic benefit placed in a general education class, even with all of the related services and supports he receives . . . .Student's limited progress with letters and numbers is found to be minimal progress in view of his significant lack of progress in core areas of communication, social skills, and behavior.  Student's absence from the classroom for segregated services or behavioral pull outs, and his separate education plan and token reward system isolate him from the class, as does his delayed rate of acquisition.  As to the nonacademic benefits of the inclusion setting, Student does not imitate or model peers in the general education class, and, for the most part, he is not engaged in the class curriculum.  He uses behavioral excesses to either escape the class or to gain negative attention.  The LH/SDC class has mainstreaming opportunities that Student may benefit from.  The teacher, students, and Activities of the general education classroom are negatively impacted by Student's behavior excesses, as well as his need for constant attention and reinforcement. There was no evidence that District's offer is based on any comparison of the cost to education Student in either the general education or SDC class.

1    not an assistive technology or an adaptive physical education assessment absent parents'

2    consent.[6]

3              Following issuance of the administrative decision, plaintiffs requested a transcript

4    of the hearing pursuant to 20 U.S.C. § 1415(h)(3) (granting plaintiffs "the right to a written, or, at

5    the option of the parents, electronic verbatim record of such hearing"), and Calif. Educ. Code §

6    56505(e)(4) (same).  The OAH's review of the electronic record demonstrated only minimal

7    recording of the third day of hearing – the hearing opened at 9:03 a.m. and terminated at 4:26

8    p.m., but only the first fifteen minutes were recorded.  The ALJ issued an order proposing her

9    Decision be vacated, the third day of hearing retried at OAH's expense, and a new decision

10   rendered.  Specifically, the ALJ offered:

> . . . (1) to vacate the decision of June 29, 2006; (2) to set a new hearing date for
> ALJ Johnson to hear anew the third day of the hearing with the same witnesses
> who testified on June 14, 2006; (3) to subpoena as witnesses Jim Merchant,
> Donovan Chapa, and Bonnie Santos, and to order OAH to bear the costs of their
> appearances; (4) to review and consider all evidence adduced during the hearing
> including June 12, 13 and a new third hearing day; and (5) to render a new

---

[6]  The concluding "Order" of the decision provides in full (Admin. Decision, at p. 19):

1.      District may conduct an occupational therapy reassessment of Student
pursuant to the triennial assessment plan of January 2006.

2.      The Parents of Student shall make him reasonably available for the
occupation therapy reassessment.

3.      District shall not conduct an assistive technology or an adaptive physical
education assessment of Student pursuant to the triennial assessment plan of
January 2006, without Parents' Consent.

4.      District's January 2006 individualized education program (IEP) offers
Student J.R. a free appropriate public education in the least restrictive
environment and is upheld.  The District may implement its January 2006 IEP
over the objections of Student and Parents and without their consent if Student
remains enrolled in the district.  District's transition plan shall include a transition
plan from the general education classroom to the learning handicapped special day
class and appropriate annual academic, functioning, and behavior goals.

In addition, the OAH found that "District prevailed on all issues for hearing in this case except
the issues of conducting an assistive technology or adaptive physical education assessment of
Student.  (Ed. Code § 56507, subd. (d) [re. attorney fees])."

1  Decision in this case.

2  See July 20, 2006 "Order Setting Telephonic Conference to Vacate Decision, Reopen Record,

3  and Repeat Third Day of Hearing for Transcript Request " (hereafter "Order Setting

4  Conference") (Exhibit 6 to TRO Motion (Docket No. 6)).  Noting plaintiffs' entitlement to a

5  verbatim record of the due process hearing (citing 20 U.S.C. § 1415(h)(3) and Cal. Ed. Code §

6  56505(e)), and the responsibility of OAH to "take appropriate action" to provide it (citing Cal.

7  Ed. Code 56505), the ALJ looked "for guidance" to Cal. Code Civil Procedure Code § 914

8  (court may vacate decision and order new trial when it is "impossible" to transcribe proceedings)

9  and § 657 (whole or partial new trial may be ordered due to mistake, accident, or irregularity in

10  the proceeding).[7]

11  The ALJ set a telephonic conference on August 7, 2006.  Pursuant to that

12  conference, the parties would not consent to retry the third day of the hearing or cooperate to

13  create an agreed-upon statement of testimony.[8]

14  Accordingly, by order filed August 31, 2006, the ALJ ordered that the June 29,

15  2006 Decision would remain binding.  See August 31, 2006 "Order re Respondent's Request for

16  Transcript" (hereafter "Order re. Transcript") (Exhibit 7 to TRO Motion (Docket No. 6)).

17  Acknowledging that neither the Education Code nor the IDEIA contained "an express remedy for

18  failure to provide the complete record of a hearing," the ALJ concluded that, "[i]n the absence of

19  consent to solve the problem by any of the proposed methods, the Decision of June 29, 2006,

20  remains binding on the parties."  Id.  The ALJ further noted (id. at 4):

21  \\\\\

22

23  [7] The ALJ noted that "While the laws pertaining to civil court proceedings do not apply
to special education due process hearings, OAH may look to them for guidance. . . . [I]f Parents
and Student appeal to a state court, these laws will probably apply, and if they file a federal civil
24  action, the federal counterparts to deal with transcript problems will probably apply."  Order re.
Transcript, at p. 3.

25

26  [8] See August 31, 2006 "Order re Respondent's Request for Transcript" (Exhibit 7 to TRO
Motion (Docket No. 6), at p. 4).

Parents and Student have the right to exercise an appeal regarding the Decision of June 29, 2006, and/or file a federal action. Parents indicate that they may wish to add the missing day of transcript to their legal issues, to argue it as a procedural violation of law. Much time and expense, and unfortunate acrimony between the parents of a young child with special needs, and the school district, may be experienced to arrive at a future time and place where a state or federal court may order a solution to the problem.

C. PROCEEDINGS BEFORE THIS COURT

Plaintiffs filed their complaint in this court on September 27, 2006, alleging the following causes of action: (1) substantive appeal of OAH's June 29, 2006 Decision and Order, against the District, Dr. Halverson, and the OAH; (2) violations of federal and state hearing statutes, against the OAH and the Department; (3) violation of § 504 of the Rehabilitation Act (29 U.S.C. § 791 et seq.), against the District, OAH and Department; (4) violation of Title II of the Americans with Disabilities Act ("ADA," 42 U.S.C. § 12101 et seq.) and the Unruh Civil Rights Act (Cal. Civ. Code §51), against the District; and (5) declaratory relief against OAH and the Department.[9]

On September 29, 2006, plaintiffs filed a motion for injunctive relief to restrain the District from implementing the June 29, 2006 Decision and Order of the Office of Administrative Hearings and to force compliance with the placement and educational findings of J.R.'s last agreed upon IEP. By order filed October 11, 2006, after hearing on October 6, the District Judge denied the motion on the ground that plaintiff had not established that J.R.'s participation in the OAH-approved IEP would cause him immediate irreparable harm. The court found it unnecessary, therefore, to reach the question whether plaintiff had demonstrated

---

[9] Plaintiffs assert the following claims for relief: (1) declaratory relief that OAH failed to comply with the procedural safeguards set forth at 20 U.S.C. § 1415(f)-(h); (2) a judgment that "OAH erred in denying Plaintiff's motion to continue the hearing to allow Plaintiff's counsel to prepare for hearing and then failed to provide a verbatim record of the proceeding; and (3) "an award of (a) injunctive relief, as to Plaintiff's educational placement until this appeal can be heard; (b) all damages sustained by reason of the wrongful acts complained of herein; (c) damages pursuant to California Civil Code Section 52(a) in an amount up to three times actual damages but no less than $4,000 per violation; (d) compensatory educational services; (e) reimbursement of educational expenses; (f) costs; (g) reasonable attorney's fees; and (h) such other and further relief as the Court shall deem just." Complaint, at pp. 15-16.

likelihood of success on the merits of his case, but the District Judge nonetheless noted "one

claim which may have some merit," viz., "whether plaintiff may succeed in claiming that his

procedural due process rights were violated by not being provided with a complete transcript of

the hearing." Order filed Oct. 11, 2006, at 8-9. The District Judge reasoned (id.):

> Section 1415 of the IDEA sets forth a multitude of procedural safeguards. One such safeguard is the provision of transcripts or audio records of due process hearings. See 20 U.S.C. § 1415 (b)(3). As discussed previously, there is no transcript of the third day of the due process hearing. The lack of a transcript is troubling.
>
> The Supreme Court has stated specifically that "the elaborate and highly specific procedural safeguards embodied in § 1415" – safeguards which include the provision of transcripts or audio recordings of due process hearings – are as important to the goals of the IDEA as any of the substantive standards set forth in the statute. Bd. of Educ. v. Rowley, 458 U.S. 176, 205-06 (1982). "Failure to comply with the procedural mandates of the IDEA 'can itself constitute the denial of a free appropriate education.'" Blackman v. Dist. of Columbia, 277 F. Supp. 2d 71, 79 (D.D.C. 2003).
>
> Thus, a question in the case is whether plaintiff may succeed in claiming that his procedural due process rights were violated by not being provided with a complete transcript of the hearing. I need not reach that issue to decide the instant motion [for TRO].

This court now turns to the merits of defendants' motions to dismiss.

III. DISCUSSION

A. LEGAL STANDARDS FOR MOTION TO DISMISS

In order to survive dismissal for failure to state a claim pursuant to Rule 12(b)(6),

a complaint must contain more than a "formulaic recitation of the elements of a cause of action;"

it must contain factual allegations sufficient to "raise a right to relief above the speculative

level." Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955, 1965 (2007). "'The

pleading must contain something more...than...a statement of facts that merely creates a suspicion

[of] a legally cognizable right of action.'" Id., quoting 5 C. Wright & A. Miller, Federal Practice

and Procedure § 1216, pp. 235-236 (3d ed. 2004).

In considering a motion to dismiss, the court must accept as true the allegations of

the complaint in question, Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740, 96 S.

1  Ct. 1848, 1850 (1976), construe the pleading in the light most favorable to the party opposing the

2  motion and resolve all doubts in the pleader's favor. Jenkins v. McKeithen, 395 U.S. 411, 421,

3  89 S. Ct. 1843, 1849, reh'g denied, 396 U.S. 869, 90 S. Ct. 35 (1969).  The court will "'presume

4  that general allegations embrace those specific facts that are necessary to support the claim.'"

5  National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 256, 114 S.Ct. 798, 803

6  (1994), quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137 (1992).

7  Moreover, pro se pleadings are held to a less stringent standard than those drafted by lawyers.

8  Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596 (1972).

9          The court may consider facts established by exhibits attached to the complaint.

10  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).  The court may also

11  consider facts which may be judicially noticed, Mullis v. United States Bankruptcy Ct., 828 F.2d

12  1385, 1388 (9th Cir. 1987); and matters of public record, including pleadings, orders, and other

13  papers filed with the court, Mack v. South Bay Beer Distributors, 798 F.2d 1279, 1282 (9th Cir.

14  1986).  The court need not accept legal conclusions "cast in the form of factual allegations."

15  Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

16          A pro se litigant is entitled to notice of the deficiencies in the complaint and an

17  opportunity to amend, unless the complaint's deficiencies could not be cured by amendment.  See

18  Noll v. Carlson, 809 F. 2d 1446, 1448 (9th Cir. 1987).

19      B. LEGAL FRAMEWORK OF THE IDEIA

20          The history of the IDEIA and role of IEPs were recently summarized by the Ninth

21  Circuit in Van Duyn ex rel. Van Duyn v. Baker School District 5J, 502 F.3d 811, 817-818 (9th

22  Cir. 2007):

23          The IDEA was enacted in 1975 because of Congress' belief that "the educational
            needs of millions of children with disabilities were not being fully met."  20
24          U.S.C. § 1400(c)(2).  The statute's stated purposes include "to ensure that all
            children with disabilities have available to them a free appropriate public
25          education . . . designed to meet their unique needs and prepare them for further
            educational, employment, and independent living," and "to ensure that the rights
26          of children with disabilities and parents of such children are protected."  § 1400

15

(d)(1)(A), (B).

. . . One of the IDEA's most important mechanisms for achieving these lofty goals is the formulation and implementation of IEPs. Under § 1414(d), every disabled child must have an IEP drafted and put into effect by the local educational authority. The IEP is to be formulated by a team that includes the child's parents, regular and special education teachers, a district representative and other individuals with relevant expertise. § 1414(d)(1)(B). It must address such matters as the child's present level of academic achievement, annual goals for the child, how progress toward those goals is to be measured and the services to be provided to the child. § 1414(d)(1)(A)(i). The child's parents are entitled to participate in meetings regarding the IEP, § 1415(b)(1), and must receive written notice of any proposed changes to the IEP, § 1415(b)(3). Either the child's parents or the local educational authority may bring a complaint to the state educational agency about any matter relating to the IEP or the child's free appropriate public education. § 1415(b)(6), (7). If such a complaint is not otherwise resolved, a due process hearing is held to determine "whether the child received a free appropriate public education." § 1415(f)(3)(E)(i). After going through the due process hearing and any other available administrative remedies, an aggrieved party may file a civil action in federal district court. § 1415(i)(2)(A).

The Supreme Court has held that "[i]nsofar as a State is required to provide a handicapped child with a 'free appropriate public education'[10] . . . it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Rowley, 458 U.S. at 203-204 (fn. omitted); see also, 20 U.S.C. § 1414(d) (setting forth content requirements of IEPs).

---

[10] A fair appropriate public education ("FAPE") is defined as "special education and related services that– (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9).

A principal goal of the IDEIA is to "mainstream" disabled children through the least restrictive placement, that is, to place them, "to the maximum extent appropriate . . .with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).[11],[12]  The Ninth Circuit relies on the following factors to determine whether a student's placement represents the least restrictive environment (Sacramento City Unified School District  v. Rachel H., 14 F.3d 1398, 1401, 1404 (9th Cir. 1994), as refined in Clyde K. v. Puyallup School District, 35 F.3d 1396, 1401 (9th Cir. 1994)):

> (1) the academic benefits of placement in a mainstream setting, with any supplementary aides and services that might be appropriate; (2) the non-academic benefits of mainstream placement, such as language and behavior models provided by non-disabled students; (3) the negative effects the student's presence may have on the teacher and other students; and (4) the cost of educating the student in a mainstream environment.

Significantly, states are not required to "maximize" each child's potential but rather to provide a "basic floor of opportunity" that "consists of access to specialized instruction

---

[11]  This requirement provides in full (20 U.S.C. § 1412(a)(5)(A):

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

[12]  As reflected by the Supreme Court (Rowley, 458 at 202-204 (fns. omitted)):

The Act requires participating States to educate handicapped children with nonhandicapped children whenever possible. When that "mainstreaming" preference of the Act has been met and a child is being educated in the regular classrooms of a public school system, the system itself monitors the educational progress of the child.  Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material.  The grading and advancement system thus constitutes an important factor in determining educational benefit.  Children who graduate from our public school systems are considered by our society to have been "educated" at least to the grade level they have completed, and access to an "education" for handicapped children is precisely what Congress sought to provide in the Act.

and related services which are individually designed to provide educational benefit to the handicapped child." Id. at 201.  It "is the rather harsh reality that the Act does not require states to 'maximize the potential of handicapped children' [and therefore] . . . that 'appropriate' does not mean 'potential-maximizing.'" P.J. By and Through W.J. v. State of Conn. Bd. of Education,788 F.Supp. 673, 679 (D.Conn.1992), citing Rowley, 458 U.S. at 189, 197, n. 21.

Accordingly, the right of parents to control the content of the IEP is limited.  "The Court was unusually emphatic in identifying one requirement the Act did not impose.  In at least four places it rejected the idea that the required education must 'maximize the potential of handicapped children.'  Thus, proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act." Kerkam v. McKenzie, 862 F.2d 884, 886 (C.A.D.C.1988), citing Rowley, 458 U.S. at 189, 197, n. 21, 198, and 199.  "Although the IDEA guarantees a free appropriate education, it does not, however, provide that this education will be designed according to the parent's desires." Shaw v. District of Columbia, 238 F.Supp.2d 127, 139 (D.D.C. 2002) (citing Kerkam, supra).  All that is required is that parents have an adequate "opportunity to participate in the decisionmaking process." § 1415(f)(3)(E)(ii)(II); see also Fuhrmann on Behalf of Fuhrmann v. East Hanover Bd. of Education, 993 F.2d 1031, 1036 (3rd Cir. 1993) (parents' participation in IEP formulation process was meaningful because they were provided with the draft IEP and given an opportunity to suggest changes, some of which were incorporated).

The Act's procedural safeguards are intended to ensure attainment of its substantive goals (Rowley, supra, 458 U.S. at 205-206):

> When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, e.g., §§ 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard.  We think that the congressional emphasis upon full participation of concerned parties

throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

The procedural mandates of the Act are so significant that, in some circumstances, failure to comply with the mandates "can itself constitute the denial of a free appropriate education." Blackman, supra, 277 F. Supp. 2d at 79. However, a procedural violation does not constitute the denial of a FAPE unless the procedural inadequacy: "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415 (f)(3)(E)(ii). See, e.g., Amanda J. ex rel. Annette J. v. Clark County School Dist., 267 F.3d 877, 892 (9th Cir. 2001) ("[n]ot every procedural violation . . . is sufficient to support a finding that the child in question was denied a FAPE").

"Civil actions" providing for judicial review of administrative rulings under the IDEIA are among the Act's intrinsic "procedural safeguards." § 1415 (d)(2)(K). "The complaint, and therefore the civil action, may concern "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." Rowley, 458 U.S. at 204-205, citing § 1415(b)(1)(E), now § 1415 (b)(6)(A).

A court's review of a complaint under the IDEIA is guided by the following: "In any action brought under this paragraph, the court – (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(C).

The Supreme Court has established a two-part inquiry for judicial assessment of complaints brought pursuant to the IDEIA: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the

1  Act's procedures reasonably calculated to enable the child to receive educational benefits?"

2  Rowley, at 206-07 (fns. omitted).[13]

3          In exercising its discretion within these guidelines, courts are to refrain from

4  conducting de novo reviews but rather are limited to determining whether the administrative

5  decision is supported by the preponderance of the evidence.  As the Supreme Court admonished

6  in Rowley (458 U.S. at 206):

> [T]he provision that a reviewing court base its decision on the "preponderance of
> the evidence" is by no means an invitation to the courts to substitute their own
> notions of sound educational policy for those of the school authorities which they
> review.  The very importance which Congress has attached to compliance with
> certain procedures in the preparation of an IEP would be frustrated if a court were
> permitted simply to set state decisions at nought. The fact that § 1415(e) requires
> that the reviewing court "receive the records of the [state] administrative
> proceedings" carries with it the implied requirement that due weight shall be
> given to these proceedings.  And we find nothing in the Act to suggest that merely
> because Congress was rather sketchy in establishing substantive requirements, as
> opposed to procedural requirements for the preparation of an IEP, it intended that
> reviewing courts should have a free hand to impose substantive standards of
> review which cannot be derived from the Act itself.  In short, the statutory

---

[13]  Cf., J.L. v. Mercer Island School District, 2006 WL 3628033, *4 (W.D.Wash.2006),
amended on reconsideration, 2007 WL 505450 (W.D. Wash. 2007) :

> It is important to note that the law regarding "disability education" underwent a
> change about ten years ago.  Prior to that time, the statutory scheme was the
> Education for Handicapped Children Act of 1975 (EHA), the purpose of which
> was solely to provide access to education for disabled students who had been
> marginalized in the public school system.  Satisfied that the goal of "access" had
> been reached, in 1997 Congress enacted the IDEA with the express purpose of
> addressing implementation problems resulting from "low expectations, and an
> insufficient focus on applying replicable research on proven methods of teaching
> and learning for children with disabilities." 20 U.S.C. § 1400(c)(4).  The statute
> clearly stated its commitment to "our national policy of ensuring equality of
> opportunity, full participation, independent living, and economic self-sufficiency
> for individuals with disabilities."  20 U.S.C. § 1400(c)(1) (emphasis supplied).
> This represented a significant shift in focus from the disability education system
> in place prior to 1997. . . . [T]he Supreme Court case of Hendrick Hudson District
> Bd. of Education v. Rowley, 458 U.S. 176 (1982) . . . interprets the EHA.  To the
> extent that the Supreme Court at that time was interpreting a statute which had no
> requirement (1) that programming for disabled students be designed to transition
> them to post-secondary education, independent living or economic
> self-sufficiency or (2) that schools review IEPs to determine whether annual goals
> were being attained, the Court must consider that opinion superseded by later
> legislation . . .

authorization to grant "such relief as the court determines is appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress.

C. MOTIONS TO DISMISS

Defendants move to dismiss:  (a) all non-IDEIA claims; (b) plaintiffs' general damages claim; (c) SUSD Superintendent Dr. John Halverson; (d) the California Department of Education; (e) the Office of Administrative Hearings; and (f) several IDEIA claims.

1. Non-IDEIA Claims

Although the IDEIA is the not the exclusive remedy for pursuing the rights of children with disabilities, 20 U.S.C. § 1415(l),[14] children may pursue their non-IDEIA claims only if legally represented.  See, Johns, supra, 114 F.3d at 877 (parents or guardians are precluded from pursuing legal claims on behalf of their minor children, whose rights must be fully protected by legal representation).  As earlier discussed, parents may proceed in this action pro se pursuant only to the IDEIA, pursuant to which the interests and rights of parents and student are coterminous.  See, Winkelman, supra, 127 S.Ct. at 2004.  The "IDEA does not differentiate . . . between the rights accorded to children and the rights accorded to parents.  As a consequence, a parent may be a 'party aggrieved' for purposes of § 1415(i)(2) with regard to 'any matter' implicating these rights [] [s]ee § 1415(b)(6)(A)").  Id.

Accordingly, given the absence of legal representation for J.R., his parents may not pursue any claims other than those made pursuant to the IDEIA.  The court will therefore recommend dismissal of plaintiffs' claims under the Americans with Disabilities Act, the

---

[14]  20 U.S.C. § 1415(l) provides in full:

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

1  Rehabilitation Act and the Unruh Civil Rights Act, specifically, Counts IV, V, and VI.

2        2.  <u>General Damages Claim</u>

3        Although injunctive relief is available under the IDEIA, "ordinarily monetary

4  damages are not."  <u>Witte v. Clark County School District</u>, 197 F.3d 1271, 1275 (9th Cir.1999).

5  <u>Accord</u>, <u>Polera v. Board of Educ. of Newburgh Enlarged City School District</u>, 288 F.3d 478, 485

6  (2nd Cir. 2002); <u>Charlie F. v. Board of Education of Skokie School District</u>, 98 F.3d 989 (7th

7  Cir.1996), <u>Sellers v. School Board of Manassas</u>, 141 F.3d 524, 527 (4th Cir. 1998), cert. denied,

8  525 U.S. 871, 119 S.Ct. 168 (1998), <u>Heidemann v. Rother</u>, 84 F.3d 1021, 1033 (8th Cir.1996);

9  <u>Crocker v. Tennessee Secondary School Athletic Assn.</u>, 980 F.2d 382, 386-87 (6th Cir.1992).

10        Accordingly, plaintiffs' claim for general damages should be dismissed.

11        3.  <u>SUSD Superintendent Dr. John Halverson</u>

12        Dr. John Halverson, Superintendent of the Sylvan Union School District, is

13  named only in his official capacity, which is, in effect, the same as suing the District.  <u>See</u>,

14  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985) ("As long as the

15  government entity receives notice and an opportunity to respond, an official-capacity suit is, in

16  all respects other than name, to be treated as a suit against the entity. . . . It is not a suit against

17  the official personally, for the real party in interest is the entity"); <u>see</u> <u>also</u>, <u>Monell v. Department</u>

18  <u>of Social Services</u>, 436 U.S. 658, 691, n. 55; 98 S.Ct. 2018, 2036, n. 55 (1978) ("local

19  government officials sued in their official capacities are 'persons' under § 1983 in those cases in

20  which . . . a local government would be suable in its own name").  In his official capacity, Dr.

21  Halverson is a redundant and, therefore, unnecessary party.  Fed. R. Civ. P. 19(a).[15]

22  \\\\\

23

24      [15]  Fed. R. Civ. P. 19 (a) ("Persons Required to Be Joined if Feasible") provides in
pertinent part: "(1) Required Party.  A person who is subject to service of process and whose

25  joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:  (A)
in that person's absence, the court cannot accord complete relief among existing parties; or (B)

26  that person claims an interest relating to the subject of the action . . ."

1    Nor can the complaint reasonably be construed as naming Dr. Halverson in his

2  personal capacity.  The complaint identifies Dr. Halverson as "the superintendent for SUSD . . .

3  responsible for the supervision of the Special Education Department and is the person within the

4  district who is ultimately responsible for SUSD's compliance with the IDEIA and California

5  Education Code."  Complaint, ¶ 6.  Dr. Halverson is named only in Counts I and III, which

6  challenge the decision of the administrative law judge, based on the contention Dr. Halverson

7  failed to help plaintiffs achieve an informal resolution of the matters now pending, resulting in

8  the denial of a FAPE to J.R.[16]  These allegations assert liability against Dr. Halverson only in his

9  official capacity; they neither allege nor demonstrate a basis for asserting personal liability

10  against Dr. Halverson, distinct from plaintiff's allegations against the District.

11    Accordingly, the court will recommend dismissal of Superintendent Halverson.

12    4.  <u>California Department of Education and Office of Administrative Hearings</u>

13    Plaintiffs allege that defendants California Department of Education (CDE) and

14  Office of Administrative Hearings (OAH) violated federal and state statutes ensuring a fair and

15  neutral hearing process, both systemically (Count II) and in the instant case (Count I); see also,

16  Count VII (seeking declaratory relief against CDE and OAH for alleged procedural violations,

17  both systemically and in the instant case).

18    CDE is named in its "supervisory role" over OAH.[17]  Although OAH is within the

19

20    [16]  The complaint provides that (a) plaintiffs sent a letter to Dr. Halverson "between April
2005 and February 2006" to resolve the issues between them and Ms. Santos, the Special
Education Director, and that "Dr. Halverson did not assist them in resolving the issues,"

21  Complaint, ¶ 32; <u>see also</u> ¶ 68 (the superintendent's failure to assist in obtaining an informal
resolution "contributed [to] the denial of FAPE between January 2006 to present"); and (b) "Dr.

22  Halverson as the superintendent for the District failed to ensure that the District met its
obligation to J.R. to provide him with an appropriate education," <u>id</u>.

23

24    [17]  The complaint provides generally that "Defendant, California Department of
Education ("CDE"), is an agency who directly receives federal funding to implement the IDEIA

25  and in its capacity as supervising department for the Office of Administrative Hearings, []an
administrative agency for the State of California.  A representative of CDE provides assurances

26  on a yearly basis that the State of California is in compliance with the requirements of the IDEIA
in order for the State of California to receive federal funding."  Complaint, ¶ 4; supervisory role

California Department of General Services, and provides administrative law judges "to fill the needs of the various state agencies," Cal. Govt. Code §§ 11370.2, 11370.3, OAH conducts administrative hearings for CDE pursuant to an interagency agreement that sets forth, inter alia, the qualifications and training of hearing officers, and the procedures for conducting due process hearings. Cal. Educ. Code § 56504.5. Notwithstanding, "[a]ny administrative law judge or other employee so assigned shall be deemed an employee of the office and not of the agency to which he or she is assigned." Cal. Govt. Code § 11370.3.

### a. Systemic Procedural Violations Claim

Plaintiffs' Count II alleges that both CDE and OAH systemically failed to meet their obligations under the IDEIA and state statutes to ensure a fair hearing process, by failing to: (i) grant continuances to allow time for families to obtain counsel, (ii) provide knowledgeable hearing officers, and (iii) obtain verbatim records of hearings.[18]

These allegations fail to meet threshold pleading requirements. As earlier noted, the factual allegations of a complaint must contain more than a "formulaic recitation of the

also noted at id., ¶¶ 58, 61, 64, 70.

[18] Plaintiffs' allegations of systemic abuses provide:

From 2005 to present, the OAH, under the supervision of CDE has, on a systematic [sic] basis, failed to grant unrepresented parents request for continuances in order to find legal counsel and have systemically denied their right to be represented at hearing as allowed under IDEIA 20 U.S.C 1415(h)(1) and (2). The foregoing allegations of a systematic [sic] violation are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. Complaint, ¶ 58.

Additionally, OAH has on a systemic basis lost or properly failed to record due process hearings which further denies parents right to a verbatim record of the hearing as provided for under 20 U.S.C. 1415(h)(3) and interferes with the right to an appeal under the IDEIA 20 U.S.C. 1415(g). Complaint, ¶ 59.

Moreover, as shown by the allegations set forth in paragraphs 55 -57, OAH has failed to provide knowledgeable hearing officers who understand federal and state laws regarding the rights of children with disabilities, possess knowledge of how conduct hearings and render and write decisions in accordance with standard legal practices as required by 20 U.S.C. 1415(f)(3)(ii)-(iv). Complaint, ¶ 60.

1   elements of a cause of action," and must "raise a right to relief above the speculative level."

2   Twombly, supra, ___U.S. __, 127 S.Ct. at 1965.  Plaintiffs' allegations of systemic procedural

3   violations are no more than conjectural, as provided by their express qualification that they "are

4   likely to have evidentiary support after a reasonable opportunity for further investigation or

5   discovery."  Complaint, ¶ 58.

6          Accordingly, the court will recommend dismissal of plaintiffs' claims asserting

7   systemic procedural violations by CDE and OAH, as set forth in Counts II and VII.

8                    b.  Procedural Violations Claims in the Instant Case

9          Plaintiffs allege that OAH and, derivatively, CDE, improperly:  (i) assigned an

10  unknowledgeable hearing officer; (ii) denied their requests for continuances, resulting in a denial

11  to them of counsel and inadequate opportunity to prepare for the due process hearing; and (iii)

12  denied plaintiffs a verbatim record of the due process hearing, thereby impairing their appeal

13  rights before this court.  For the following reasons, the court will recommend dismissal of all but

14  the third of these claims, for which CDE and OAH need no longer remain parties to this action.

15                              i.  Hearing Officer

16         Plaintiffs' general allegations do not support their claim that ALJ Johnson acted

17  unknowledgeably in this case.  See Cal. Educ. Code § 56505(c) (qualifications of hearing

18  officers).  On the contrary, as these findings and recommendations recount and conclude, the

19  available record demonstrates that ALJ Johnson was not only well-informed with respect to the

20  factual and legal issues in this case, but made every effort to resolve procedural issues as they

21  arose.

22                         ii.  Requests for Continuance

23         Nor does the court find any error in the ALJ's rulings denying plaintiffs' repeated

24  requests for continuance.  The court initially notes that, although asserted by no party, the matter

25  may be outside this court's jurisdiction based on plaintiffs' failure to seek interlocutory review.

26  See Cal. Gov. Code § 11524 (c) ("In the event that an application for a continuance by a party is

1  denied by an administrative law judge of the Office of Administrative Hearings, and the party

2  seeks judicial review thereof, the party shall, within 10 working days of the denial, make

3  application for appropriate judicial relief in the superior court or be barred from judicial review

4  thereof as a matter of jurisdiction").  The court will nonetheless address the merits of this matter,

5  as have the parties, because plaintiffs' decision minimally to participate in the due process

6  hearing and to submit no evidence of their own was based on their erroneous belief they had been

7  denied fundamental procedural rights that would be vindicated in this appeal.

8         Parents retained legal counsel who successfully opposed the District's initial due

9  process complaint filed September 2005, based on improper service and notice to parents.

10  Complaint, ¶¶ 28, 29.  Parents terminated this representation based on the belief "they no longer

11  required legal assistance and due to the financial hardship the legal services imposed."  Id. at ¶

12  30.  Thereafter, following the District's filing of the instant due process complaint March 1,

13  2006, plaintiffs again sought legal counsel.  Attorney Elizabeth Aaronson was retained May 26,

14  2006, but agreed to represent plaintiffs if they could obtain a continuance of the due process

15  hearing scheduled to commence June 12, 2006.[19]

16         Ms. Aronson filed two requests for continuance.  The first, filed May 30, 2006,

17  requested continuance of the June 6 prehearing conference and the June 12 hearing, on the

18  ground that Ms. Aronson had "just been retained . . . and require[d] time to prepare for the case .

19  . . [and was] unable to appear for hearing the week of June 12 due to scheduled mediation and

20  surgery."  AR, at p. 49; see also id. at 57, 61, 75-76.  The District opposed the request and filed a

21  Prehearing Conference Statement.  Id. at 566-585, 75, 94 et seq.  The pretrial hearing conference

22

23         [19]  The due process hearing was originally scheduled for April 27, 2006.  AR, at pp. 14-
    16.  The District sought a continuance of the hearing to May.  Id. at 25-28.  Parents responded
24  April 5, 2006, with their own request for continuance to allow them sufficient time to obtain
    counsel, and included a list of 25 special education attorneys whose representation they had
25  sought through March 2006.  Id. at 32-38.  The District set a telephonic trial setting conference
    for May 1, but both the District and parents' advocate, Ms. Maggio, sought further continuance.
26  Id. at 47, 40-46.  That conference was held May 5, memorialized by written order filed May 8,
    2006, pursuant to which the due process hearing was set to begin June 12, 2006.  Id. at 90-93.

proceeded as scheduled, with Ms. Aronson initially failing to appear based on her assumption the

matter had been continued. Id. at 586; June 6, 2006 Prehearing Conference Transcript, at pp. 5-

6, 19, 21-24. Following a telephonic hearing involving all parties (id. at 24-34), the ALJ denied

parents' request for continuance (id. at 31) on the following grounds, later memorialized by

written order (AR at 586-587):

> Student has failed to establish good cause to continue the hearing. Student's
> claim that Parents have tried in good faith to retain counsel is not supported by
> any evidence subsequent to March 2006. District has shown that it would have
> significant witness problems if the matter is continued, and that District apprised
> Student of those problems when the matter was last continued. In particular,
> District's Director of Special Education Bonnie Santos, a material witness who
> was present by telephone during the conference calls on June 6, 2006, will be
> unavailable most of July, and the attorney for the District is not available the latter
> half of June. The motion for continuance is denied.

In addition, the ALJ found plaintiffs in violation of the May 8, 2006 prehearing order requiring

disclosure of witnesses and evidence prior to the June 6 conference; the ALJ ordered plaintiffs to

produce these lists at the commencement of hearing on June 12, 2006.

Ms. Aronson's second request for continuance, which the ALJ indicated she

would entertain (June 6, 2006 Prehearing Conference Transcript, at pp. 31-32), was filed June 8,

2006 (AR at 596-598), as were declarations from Ms. Aronson (id. at 600-602), Ms. Maggio (id.

at 608-609) and parents (id. at 592-593). Parents indicated they had "worked diligently to retain

legal representation since receiving notification of [the] due process hearing,"[20] and "also worked

diligently to obtain additional information required from outside professionals to prepare our

case," including "key witness" Dr. Paula Gardner, who "will be conducting observations for the

inclusion assessment this month (June 2006)." AR at 592. Ms. Aronson asserted that the

---

[20] Parents stated that they "continued to make calls during April and May to the attorneys
(25) from the list that we submitted in our declaration dated, April 5, 2006. We have also sought
additional referrals, and made contact with all Attorneys that we were referred to. The few
attorneys that we were successful at reaching expressed concerns about taking our case, as they
could not commit to a case that was already scheduled for hearing with no guarantee that the date
would be moved to allow them sufficient time to prepare. [¶ ] On March 12, 2006, we contacted
Elizabeth Aronson's office, she . . . stated that she could only take the case if she could get a
continuance." AR at 592.

1    rationale for her motion – i.e., (i) she was new to the case and did not have time adequately to

2    prepare for hearing; (ii) she was unavailable to appear on the dates set for hearing; and (iii)

3    parents had not had an opportunity to prepare for the presentation of evidence and witnesses –

4    met the "good cause" requirement  for granting a continuance, as set forth at Cal. Educ. Code §

5    56505 and Cal. Govt. Code § 11524.  Ms. Aronson argued that denying the motion would

6    effectively deny plaintiffs their "right to be accompanied and advised . . . by individuals with

7    special knowledge or training with respect to the problems of children with disabilities" and

8    "right to present evidence and compel the attendance of witnesses," as set forth at 20 U.S.C. §§

9    1415(h)(1) and (2).  AR at 596-598.

10           Pursuant to a second telephonic pretrial hearing conference, held June 9, 2006, the

11   ALJ denied Ms. Aronson's second motion for continuance with the exception of permitting

12   plaintiffs, on July 10, 2006, to present the testimony and evidence of their independent

13   evaluator(s).  June 9, 2006 Prehearing Conference Transcript, at p. 40.  The ALJ explained her

14   rationale by written order filed June 13, 2006 (AR at 627-630), as amended June 15, 2006 (id. at

15   631-634), wherein she noted the statutory requirements for an expeditious hearing and decision

16   in IDEIA cases, Cal. Educ. Code § § 56502(d) and 56505(f), and explained that parents'

17   advocate, Ms. Maggio, who had represented parents at the trial setting conference May 5, 2006,

18   had agreed to the hearing dates.  AR at 632.  Noting that Ms. Aronson had not learned of the

19   actual dates for the hearing until May 31, 2006, four days after her conditional retention by

20   plaintiffs (id. at 597), the ALJ concluded that "Ms. Aronson was already unavailable to represent

21   Parents when they retained her" (id. at 632-633).  Accordingly, reasoned the ALJ, Ms. Aronson's

22   arguments of  unavailability and lack of preparedness were unavailing, as was parents' claim of

23   impossibility in presenting witnesses and evidence.  The only exception permitted by the ALJ

24   was to accord parents the opportunity to present the evaluation they had already obtained from an

25   expert with Behavioral Educational Consultants for Children with Autism ("BECCA") and

26   possibly another evaluation from Dr. Gardner.  The ALJ ruled that after the District concluded its

1  case, the hearing would be continued to July 10, 2006 for presentation of parents' witnesses and

2  evidence provided they disclosed their lists of proposed witnesses and documents at the

3  commencement of the due process hearing on June 12, 2006.  Id. at 633-634.

4           On the first day of hearing, plaintiffs filed substitutions of attorney, placing

5  themselves in pro se.  TR (Vol. 1), at 4.  They were, however, accompanied by Ms. Maggio, who

6  did not participate in the hearing.  Although the ALJ reminded parents they would be permitted

7  to introduce their evidence and BECCA witness on July 10 (id. at 3, 21-28; TR (Vol.II) at 5),

8  parents stated their intent to be present at the hearing but not to testify (see, e.g., TR (Vol. 1) at

9  28, TR (Vol. II) at 9); they did not disclose any witnesses or evidence.  The ALJ deferred this

10  matter to the third day of hearing.  Although the relevant testimony was not recorded that day, the

11  ALJ's subsequent decision explains,  "Although both June 15, and July 10, 2006, were made

12  available to Parents to present evidence for the ALJ's consideration, Parents declined both dates,

13  and stated that they believed they could not retain counsel by July 10, 2006."  Admin. Decision,

14  at p. 4.

15           A request for continuance of a due process hearing should be granted upon a

16  showing of good cause.  See Cal. Educ. Code § 56505(f)(3) ("[e]ither party to the hearing may

17  request the hearing officer to grant an extension.  The extension shall be granted upon a showing

18  of good cause"); Cal. Gov. Code § 11524(a) (". . . When an administrative law judge of the

19  Office of Administrative Hearings has been assigned to the hearing, no continuance may be

20  granted except by him or her or by the presiding judge of the appropriate regional office of the

21  Office of Administrative Hearings, for good cause shown").

22           Parents assert, albeit implicitly, they demonstrated good cause for further

23  continuance of the due process hearing by offering evidence they had retained counsel and were

24  pursuing independent evaluations of J.R., pursuant to the procedural safeguards set forth in 20

25  \\\\\

26  \\\\\

U.S.C. § 1415(h)(1) and (2).[21]   However, these safeguards are not absolute rights; they are qualified both in scope and reasonableness.  Parents and students have no absolute right to be represented by counsel at a due process hearing.  They must, however, be accorded a reasonable opportunity within which to obtain legal representation or the assistance of individuals with specialized knowledge, and to organize their evidence and witnesses for presentation at the hearing.

Parents were notified of the due process hearing, originally scheduled for April 27, 2006, by the District's March 1, 2006 filing of the due process complaint.  Parents reasonably should have anticipated the District's filing when they declined to sign the IEP proposed by all other members of J.R.'s IEP team on January 31, 2006, and based on the District's prior filing of a due process complaint.  Pursuant to the requests of both plaintiffs and the District, all dates were suspended until the trial setting conference on May 5, 2006.  By then, plaintiffs had been on notice for two months they would be required to participate in a hearing.  At this juncture, found the ALJ, Ms. Maggio, plaintiffs' advocate and spokesperson, agreed on the June 12, 2006

\\\\\

---

[21] 20 U.S.C. § 1415(h) ("Safeguards") provides:

Any party to a hearing conducted pursuant to subsection (f) or (k) of this section, or an appeal conducted pursuant to subsection (g) of this section, shall be accorded--
(1)  the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;
(2)  the right to present evidence and confront, cross-examine, and compel the attendance of witnesses;
(3)  the right to a written, or, at the option of the parents, electronic verbatim record of such hearing; and
(4)  the right to written, or, at the option of the parents, electronic findings of fact and decisions, which findings and decisions--
    (A)  shall be made available to the public consistent with the requirements of section 1417(b) of this title (relating to the confidentiality of data, information, and records); and
    (B)  shall be transmitted to the advisory panel established pursuant to section 1412(a)(21) of this title.

1   hearing date.[22]

2        When confronted with the May 30, 2006 and June 8, 2006 requests for

3   continuance by plaintiffs' newly retained counsel, the ALJ was tasked with balancing plaintiffs'

4   last-minute requests with the prospective unavailability of District witnesses until August, and

5   the possibility this matter could not be resolved until after the beginning of the new school year.

6   Balancing the respective needs of the parties with her statutory duties to expedite the hearing and

7   decision, the ALJ reasonably declined to grant further continuance.

8        The conditional retention of plaintiffs' counsel and plaintiffs' averment they were

9   still attempting to obtain independent assessments of J.R. were, simply put, "too little, too late"

10  when balanced with the exigencies of trying to resolve J.R.'s placement before he commenced a

11  new school year.  Parents' apparent familiarity with the IDEIA process, because another of their

12  children also receives special education services, was a legitimate consideration by the ALJ.  See

13  Admin, Decision, at p. 5, n. 3 (" The involvement of Parents in special education over many

14  years tends to undermine their assertion that they do not understand what is going on in this

15  case").  Parents do not explain whether their reference to being "inappropriately berated" by the

16  ALJ on the third day of hearing (Complaint, ¶ 41) was related to their requests for continuance;

17  the only relevant comment by the ALJ recorded that day was her ongoing encouragement that

18  

19      [22]  Ms. Maggio disputes this finding in her declaration filed in support of Ms.
20  Aarsonson's second request for continuance.  Ms. Maggio stated in pertinent part (AR at 609):

21      On May 5, 2006, I participated in a TSC call with the OAH, and Ms. Sarah
        Daniel, Attorney for the Sylvan Union School District.  During the TSC call I
22      stated that Mr. and Mrs. Ramey had not yet been successful at retaining legal
        representation for their son.  I also stated that I could not agree to any dates as I
        was not qualified to represent Mr. an[d] Mrs. Ramey in a due process hearing.
23      Ms. Daniel did not agree to a continuation.  The TSC call administrator placed the
        hearing back on calendar for June 12, 2006, and instructed me to file another
24      continuance request.

25  The court does not further pursue this matter because (1) plaintiffs do not raise it, and (2) the
    April 12, 2006 Notice of Telephonic Trial Setting Conference directed the parties to "be
26  prepared" to "schedule hearing dates."  AR at 47.

1  parents actively participate in the hearing.  See, TR (Vol. 3), at pp. 3-4 ("[A]gain I invite you and
2  urge you to participate in hearing this morning in the best interests of your son").

3         Consistent with the ALJ's general encouragement to parents and repeated offers to
4  assist them in presenting their case (see, e.g., TR (Vol. 1) at 18 ("I would like to work with you
5  to accommodate you representing yourself during this hearing. . ."), was the ALJ's repeated offer
6  to continue the hearing until July 10 to permit plaintiffs additional time to obtain the report of
7  their expert(s) and any other relevant information on their son's behalf.  Parents' rejection of this
8  offer, in the hopes that a reviewing court would overturn the ALJ's decision on procedural
9  grounds, was a calculated risk that, unfortunately, worked to undermine their own case.  Parents'
10  purposeful decision to refrain from participating in the due process hearing is underscored by the
11  silent presence of Ms. Maggio merely "to support the family through the process" (TR (Vol. 1) at
12  5), despite her expertise and preparation for hearing.[23]  As the ALJ pointed out to parents,
13  "you've had the services of an advocate since April" (id. at 14), a final factor weighing in favor
14  of the ALJ's ruling.

15         Accordingly, the court finds that plaintiffs failed to demonstrate good cause for
16  further continuance of the due process hearing.  The ALJ's reasons for denying plaintiffs'
17  motions for continuance were valid, persuasive and supported by the record.

18                iii.  Incomplete Transcript

19         It is uncontested there exists only a partial transcript of the administrative hearing
20  for this court's review.  For the reasons that follow, this matter is significant and requires a
21  remand to the administrative law judge to retry the third day of hearing and issue a new decision.

22         Parents' right to a verbatim record of the entire due process hearing is an explicit
23  procedural safeguard accorded by the Act.  20 U.S.C. § 1415(h)(3) (parties have "the right to a

24  ───────────────────────

25     [23]  Ms. Maggio described herself as a "private Special Education Advocate . . . [who was]
    hired by [parents] to provide guidance in the IEP process for their son," attempted to locate legal
26  representation for them, and worked "numerous hours . . . with the family to prepare for the
    hearing."  Maggio Decl, filed June 8, 2006, AR at 608-609.

written, or, at the option of the parents, electronic verbatim record of such hearing"), and Calif. Educ. Code § 56505(e)(4) (same).  Plaintiffs contend the absence of a complete transcript impairs their right to appeal pursuant to 20 U.S.C. 1415.[24] Complaint, ¶¶ 59, 96.  The merit of this claim turns on whether plaintiffs would be prejudiced by this court's reliance on the partial transcript in its substantive review of the administrative decision.  See, e.g., Kingsmore ex rel. Lutz v. District of Columbia, 466 F.3d 118, 119-120 (D.C. Cir. 2006) (failure to provide complete transcript is actionable under the IDEA only upon showing of substantive harm), citing Lesesne ex rel. B.F. v. District of Columbia, 447 F.3d 828, 834 (D.C. Cir. 2006) (procedural violation under IDEA is viable only if it affected student's substantive rights); Amann v. Stow School System, 982 F.2d 644, 653 (1st Cir. 1992) (loss of tape and lack of transcript of hearing on parents' motion to reopen "caused no substantive injury" "because the hearing officer spelled out in writing her reasons for denying the request to re-open, and because we have found that she was within her discretion to make the denial"); Stringer v. St. James R-1 School District, 446 F.3d 799, 805 (8th Cir. 2006) (failure to provide audio recording upon parents' request was harmless error because they were provided with verbatim transcript).[25]

---

[24] Plaintiffs assert, incorrectly, that their right to appeal is established by 20 U.S.C. § 1415(g), which is applicable only to "two-tiered" state hearing systems.  However, California is a "one tier" system.  See Porter v. Board of Trustees of Manhattan Beach Unified School District, 307 F.3d 1064, 1067, n. 1 (9th Cir. 2002) ("California's hearing system is known as a 'one tier' system because the initial hearing is conducted by the state education agency.  In a 'two-tier' hearing system, the initial hearing is conducted by the local education agency, the decision of which either party may appeal to the state education agency.")  Accordingly, plaintiffs' right to appeal is based on their right to judicial review pursuant to § 1415(i)(2).

[25] Accord, e.g., Peterson v. Roe, 2006 WL 1455434 (E.D. Cal. 2006) (adopted in full, 2006 WL 2711615 (E.D.Cal. 2006)) (rejecting habeas petitioner's constitutional claim based on incomplete transcript because missing pages "are not necessary to a resolution of the pending petition," citing "Mitchell v. Wyrick, 698 F.2d 940, 941- 42 (8th Cir.1983) (lack of a complete record does not necessarily result in a denial of due process but rather prejudice must be established); see also Ortiz Salas v. INS, 992 F.2d 105, 106 (7th Cir.1993) (requiring petitioner 'to make the best feasible showing he can that a complete and accurate transcript would have changed the outcome of the case'); White v. Florida Dep't of Corrections, 939 F.2d 912, 914 (11th Cir.1991) (requiring showing of prejudice); Bransford v. Brown, 806 F.2d 83, 86 (6th Cir.1986) (same)").

1    The missing portion of the hearing transcript contains significant substantive

2   testimony, specifically, the testimony of two of the District's four "expert" witnesses,[26] one of

3   whom the District designated its "key witness," SUSD Special Education Director Bonnie

4   Santos.  See, June 9, 2006 Pre-Hearing Conference Transcript, at 20:2 (Dr. Santos referred to as

5   District's "key material witness" by ALJ), 22:13 (Dr. Santos referred to as "my key witness" by

6   District's counsel), 34:16-17 (Dr. Santos described by District's counsel as "the person who

7   District has decided needs to represent them, because she is the only individual with the

8   historical knowledge of this case").  Also testifying on the third hearing day were Donovan

9   Chapa, the ABC Senior Behavior Consultant primarily responsible for providing direct support

10   services to J.R. since February 2002, and school psychologist James Merchant, M.S., who

11   conducted a one-time evaluation of J.R. in May 2006.  The ALJ placed "great weight" on the

12   testimony of Mr. Chapa and Mr. Merchant, as well as J.R.'s general education teacher, Mrs.

13   Sluggett, whose testimony was obtained and recorded on the second day of hearing.  Admin.

14   Decision, at p. 17 ("[t]he testimony of Student's general education teacher, the school

15   psychologist James Merchant, and the ABC Senior Behavioral Consultant who has overseen

16   Student's services for many years, are entitled to great weight").

17    Dr. Santos' resume states she was the District's Director of Special Education

18   since 2001, "including Program Specialist for all special education placements in both public and

19   non-public schools."  AR at 555 (resume set forth at AR 555-561 (Exh. 69)).  The record

20   indicates that Dr. Santos was involved in evaluating and providing services to J.R. since he

21   commenced kindergarten in 2004.  Dr. Santos was parents' principal contact with the District

22   and, together with ABC's Donovan Chapa, served on all of J.R.'s IEP teams.  Dr. Santos

23   represented the District at the due process hearing.  Admin. Decision, at p. 1.  Her testimony was

24

25    [26] See Petitioner's Prehearing Conference Statement (District's Expert Witness List), AR
    at 96-97.  The District's remaining two experts –  Miriam Bermann, J.R.'s occupational

26   therapist; and Cinnamon Simpson, a behavior analyst without firsthand knowledge of J.R. –
    testified the second day of hearing and their testimony was fully recorded and transcribed.

1  sufficiently important to the District that its counsel objected to the ALJ's suggestion parents be

2  permitted to introduce their evidence in July 2006, when Dr. Santos would be "on vacation out of

3  the country," id. at 19:24-25, or, for that matter, at any time after June 2006, because Dr. Santos

4  planned to retire from her position as Special Education Director effective June 30, 2006, id. at

5  33:20-22.  Dr. Santos' availability was pivotal to the ALJ in denying plaintiffs' requests for

6  continuance.  AR at 586-587.  Significantly, none of Dr. Santos' testimony was recorded and the

7  administrative record does not contain any overall report, summary or statement prepared by Dr.

8  Santos.  Nor is Dr. Santos' testimony recounted in the administrative decision, although the

9  District is referenced throughout.  Dr. Santos' central role as the District's Special Education

10  Director and on J.R.'s IEP team requires the presentation of some evidence upon which this court

11  can evaluate the ALJ's deference to the District's recommendations.

12          The second of the District's expert witnesses whose testimony was not recorded

13  was ABC Consultant Donovan Chapa, the principal direct service provider to J.R. since February

14  2002.  Admin. Decision, at 5.  None of Mr. Chapa's testimony was recorded.  The administrative

15  decision contains repeated references to Mr. Chapa's testimony and his opinions since 2004.  Mr.

16  Chapa's most recent views are set forth in a detailed "Update Report" dated May 26, 2006.  AR

17  at 531-540 (Exh. 64).  The administrative decision essentially adopted this report's

18  recommendation that J.R. "would make greater school-based gains in a placement more closely

19  suited to his needs," with a "denser level of teacher/student interactions" and "denser schedule of

20  class-wide reinforcement."  AR at 538.  However, without some record of Mr. Chapa's

21  testimony, including pertinent questioning by the administrative law judge, this court cannot

22  assess whether the ALJ simply "rubber stamped" Mr. Chapa's recommendations or made a

23  thoughtful decision based on a preponderance of all the evidence.

24  \\\\\

25  \\\\\

26  \\\\\

1     Also testifying on the third day was school psychologist James Merchant, who

2  evaluated J.R. May 2006 in anticipation of the due process hearing.[27]   The beginning of his

3  testimony was recorded but provides only his professional background and current position in the

4  Sylvan Union School District.   The transcript ends after District's counsel directed the court to

5  Exhibit 70, Mr. Merchant's "Psychological Report" of J.R. (set forth at AR 562-565).   Standing

6  alone, the report appears equivocal at best.   For example, Mr. Merchant concluded that J.R.'s

7  "intellectual ability is well below average when compared to children his age," but "some [of his]

8  academic scores [when] compared to grade level students are higher than when compared to age

9  appropriate students."  Id. at 565.  Mr. Merchant discounted the latter finding based on the fact

10  J.R. "has had two years of kindergarten and intensive behavioral intervention," and concluded

11  that his "[a]cademic skills vary widely with some relative strengths and weaknesses.   Overall he

12  continues to struggle academically . . ."  Ibid.  These findings – with respect to a child for whom

13  academic expectations remain modest – require elucidation.  Further, Mr. Merchant's "cookie

14  cutter" conclusion that "[t]ypically a child with this profile ['Autism Spectrum Disorder']

15  requires extensive support and intervention to provide needed structure and consistency in his

16  environment" (ibid.), based upon his one-time assessment of J.R., begs for hard questioning.  The

17  court is unwilling to accept the ALJ's reliance on this assessment without reviewing Mr.

18  Merchant's testimony.

19     The court is persuaded that the ALJ made significant efforts to resolve, at the

20  administrative level, the problem of the missing transcript.  As soon as the problem became

21  apparent, the ALJ issued an order proposing that the decision be vacated, the third day of hearing

22  retried at OAH's expense, and a new decision rendered.  See July 20, 2006 "Order Setting

23  Telephonic Conference to Vacate Decision, Reopen Record, and Repeat Third Day of Hearing

24

25

26     [27]  Mr. Merchant stated that he was informed by the resource specialist at Freedom School (J.R.'s school) in May 2006 that J.R. needed to be tested; Mr. Merchant conducted the psychological testing of J.R. on May 25, 2006.  See TR (Vol. 3) at 4-15.

1   for Transcript Request " (Exhibit 6 to TRO Motion (Docket No. 6)).  It was the opinion of the

2   ALJ that "[t]he third day of hearing is capable of being litigated again without significant loss of

3   evidentiary content" because the day's witnesses were not subject to cross examination [by

4   plaintiffs], the related documentary exhibits were admitted into evidence, and both the ALJ and

5   the District's attorney had notes for guidance.  Id. at 3.  However, pursuant to a telephonic

6   conference on August 7, 2006, neither plaintiffs nor the District would consent to retry the third

7   day of hearing or, alternatively, cooperate to create an agreed-upon statement of testimony; the

8   ALJ had no choice but to make binding the June 29, 2006 decision.  See August 31, 2006 "Order

9   re Respondent's Request for Transcript" (hereafter "Order re. Transcript") (Exhibit 7 to TRO

10  Motion (Docket No. 6)).

11          The lack of a complete transcript for the third day of hearing renders this court

12  unable to assess whether the administrative decision is supported by the preponderance of

13  evidence.  20 U.S.C. § 1415(i)(2)(C)(iii).  The written record does not adequately "fill the gaps"

14  created by the missing transcript.  Moreover, the missing transcript also contains plaintiffs'

15  concluding rationale for their decision to present no evidence or witnesses.[28]

16          Given the "great weight" the ALJ placed upon the missing testimony of Mr.

17  Chapa and Mr. Merchant (and, presumably, Dr. Santos), the court finds it inappropriate to

18  receive prepared statements by these parties which purport to recount their testimony or to hear

19  their testimony anew pursuant to this court's authority to "hear additional evidence at the request

20  of a party" (20 U.S.C. § 1415(i)(2)(C)(ii)), as defendants have suggested.  The court's authority

21  is appropriately limited to "supplemental evidence," not to providing one side or the other with

22

23          [28] The undersigned has considered and rejected any type of waiver argument.
    Superficially, if a party has opposed and made impossible the only practical remedy, that waiver
24  may inure to the ultimate detriment of the waiving party.  The undersigned considered whether
    plaintiffs' due process argument should be rejected and plaintiff be left with a due process claim.
25  However, defendants did not argue waiver, and it appears from the record that defendants opposed
    the "re-do" of the third hearing day as well when such was proposed administratively.
26  Thus, defendants "waived the waiver," both in the underlying proceedings and in this court if
    they were inclined at all to assert the default at all.

the opportunity to expound upon prior testimony.  See, e.g., Ojai Unified School Dist. v. Jackson, 4 F.3d 1467, 1473 (9th Cir. 1993) (allowing supplemental evidence of only "relevant events occurring subsequent to the administrative hearing," and adopting First Circuit's standard for admission of additional evidence in IDEA cases, as articulated in Town of Burlington v. Department of Educ. for Com. of Mass., 736 F.2d 773, 790 (1st Cir. 1984) (reviewing court precluded from hearing trial testimony of administrative hearing witness on same matters addressed at hearing so as to prevent de novo assessment of evidence)).  As the First Circuit reasoned in Burlington, the district court's authority to hear additional evidence "does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony," and this construction "structurally assists in giving due weight to the administrative proceeding, as Rowley requires."  Ibid.; see Rowley, 458 U.S. at 206 ("[t]he fact that § 1415(e) requires that the reviewing court 'receive the records of the administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings").

Under the circumstances of this case, hearing anew the testimony of three witnesses, including the District's "expert witness," whose opinions weighed significantly in the administrative law judge's decision, would necessarily and impermissibly result in this court's de novo review of all the evidence.  Accordingly, to maintain this court's limited review role – assessing whether the administrative decision is supported by the preponderance of evidence (20 U.S.C. § 1415(i)(2)(C)(iii)) – it is necessary to require that which the ALJ originally offered, i.e., to remand this case to the administrative law judge[29] with directions to retry the third day of

---

[29]  See, e.g., Carlisle Area School v. Scott P. By and Through Bess P., 62 F.3d 520, 525-526 (3rd Cir. 1995) (authorizing remands to administrative hearing officers by district court for purposes of clarification despite prohibition on such remands within the state's two-tier administrative review system); A.A. ex rel. E.A. v. Exeter Tp. School Dist., 485 F.Supp.2d 587, 590 (E.D. Pa. 2007) (authorizing partial remand to state administrative appeals panel for application of appropriate case law); L.M. ex rel. H.M. v. Evesham Tp. Bd. of Educ., 256 F. Supp. 2d 290, 305 (D.N.J. 2003) (remanded to ALJ to assess whether student was denied FAPE and whether parents entitled to reimbursement for student's private educational expenses, after upholding parents' right unilaterally to move student); not WHRSD failed to offer M.B. a proper J.B. v. Watchung Hills Regional School Dist. Bd. of Educ., 2006 WL 38936, *5 (D.N.J. 2006)

1    hearing and issue a new decision.  Upon remand plaintiffs should again be offered the

2    opportunity – without any enlargement of time – to present any witnesses or evidence on their

3    son's behalf.

4                    c.    Dismissal of CDE and OAH

5            Both CDE and OAH move generally for dismissal from this action.[30]  Based upon

6    this court's finding that plaintiffs' only meritorious challenge alleged against either entity is the

7    incomplete transcript of the administrative hearing, the court need not reach CDE's contention

8    plaintiffs failed to administratively exhaust their other claims against it.[31]  While there are

9    _____

10   (same); L.J. ex rel. V.J. v. Audubon Bd. of Educ., 2006 WL 3825135, *3 (D.N.J. 2006) (noting
     authority to remand but declining to do so for clarification of administrative order); Blount ex rel.
11   Blount v. Lancaster-Lebanon Intermediate Unit, 2003 WL 22988892,*6 (E.D. Pa. 2003) (finding
     district court has discretion to remand to hearing officer for reconsideration under proper
12   standard).

13         [30]   CDE does not, and cannot, seek dismissal based on Eleventh Amendment immunity.
     "[T]he IDEA contains an express abrogation of sovereign immunity as to suits brought pursuant
14   to it."  Board of Education of Pawling Central School Dist. v. Schutz, 137 F. Supp. 2d 83, 87
     (N.D.N.Y. 2001).  Due to states' receipt of federal funds pursuant to the IDEIA (20 U.S.C. §
15   1411), Congress has explicitly declared that a state cannot invoke Eleventh Amendment
     immunity from suit for a violation of the IDEIA.  20 U.S.C. § 1403(a) ("A State shall not be
16   immune under the 11th amendment to the Constitution of the United States from suit in Federal
     court for a violation of this chapter"); see also, § 1403(b) ("remedies both at law and in equity"
17   available against a state to the same extent as available against any other public entity);   Board
     of Education v. Kelly E., 207 F.3d 931, 935 (7th Cir. 2000) (although § 1403(a) of the IDEA
18   "does not use words such as 'consent' or 'waiver,' it is hard to see why that should matter.
     Congress did what it could to ensure that states participating in the IDEA are amenable to suit in
19   federal court"), cert. denied, 531 U.S. 824, 121 S.Ct. 70  (2000); M.A. ex rel. E.S. v.
     State-Operated Sch. Dist. of the City of Newark, 344 F.3d 335, 348 (3rd Cir. 2003) (same).

20
           [31]   The court notes, nonetheless, that the requirement of administrative exhaustion in
21   IDEA cases "is not a rigid one, but subject to certain exceptions" that turn on "whether pursuit of
     administrative remedies under the facts of a given case will further the general purposes of
22   exhaustion and the congressional intent behind the administrative scheme."  Hoeft v. Tucson
     Unified School District, 967 F.2d 1298, 1302-1303 (9th Cir. 1992).  However, plaintiffs should
23   have exhausted their case-specific allegations against CDE.  See, e.g., B.H. v. Southington Bd. of
     Education, 273 F.Supp.2d 194, 200 (D. Conn. 2003) (dismissing Connecticut Department of
24   Education and its Commissioner because plaintiffs had not requested due process hearing to
     resolve their claim, raised for first time in district court, that state defendants failed to meet their
25   supervisory obligations under 20 U.S.C. § 1413(h) to ensure that local educational agency
     provided a FAPE, reasoning "the court is not prepared to conclude that an SEA [state educational
26   agency] can be held liable for failure to supervise an individual child's IEP unless the SEA is
     given clear notice, via the complaint procedure . . . that a local school district is denying the child

circumstances warranting later joinder of state educational agencies in disputes originating

between a local education agency and parents concerning the provision of a FAPE,[32] based on the

responsibility of state educational agencies to ensure local compliance with the Act pursuant to

20 U.S.C. § 1412(a)(11)(A),[33] there is no such basis for requiring CDE's presence in the instant

action.  This case does not present colorable claims of systemic procedural violations warranting

a FAPE"); Whitehead v. School Bd. for Hillsborough County, 932 F.Supp. 1393, 1396 (M.D. Fla. 1996) (plaintiffs may not "piggyback [supervisory] DOE claim on a favorable outcome previously reached against a subordinate agency" because "[a] purpose of requiring exhaustion of remedies is to provide state agencies an opportunity to resolve system defects without unnecessary judicial involvement"); Pachl v. Seagren, 453 F.3d 1064, 1070 (8th Cir. 2006) (complaint against Minnesota Department of Education in its supervisory role under the IDEA "fail[ed] to articulate a specific manner in which [plaintiffs] believe[d] the Department ha[d] neglected its duties to monitor the school district, implement corrective action, or otherwise ensure that IDEA requirements [were] met" and therefore failed to state a claim against the Department).  Plaintiffs could have named CDE in the District's action or pursuant to a contemporaneous hearing request.  See 20 U.S.C. §§ 1415(b)(6)(A), and (o).

   [32]  See, e.g., Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 696-97 (3d Cir.1981) (affirming district court's decision holding state ultimately responsible for providing student with a proper educational program, because "[r]esolution of any interagency conflicts or delegation of duties from state to regional and local levels . . . should [be] . . . in the hands of the state officials," not the courts); Gadsby v. Grasmick, 109 F.3d 940 (4th Cir.1997) (plaintiffs permitted to assert reimbursement claim against Maryland State Department of Education for student's private school tuition based on failure of local school district to develop a FAPE, following state's effective denial of local agency's application for reimbursement); St. Tammany Parish Sch. Bd. v. State of Louisiana, 142 F.3d 776, 783-85 (5th Cir.1998) (followed Gadsby in holding state liable for costs of student's "stay put" placement, rejecting state's exhaustion argument on ground that state had rejected opportunity to participate in administrative proceedings); John T. ex rel. Robert T. v. Iowa Dept. of Educ. 258 F.3d 860, 864 -865 (8th Cir.  2001) (state educational agency named for first time in district court was held liable for plaintiffs' attorney fees for legal work performed before the court based on rationale, inter alia, that state "zealously opposed" plaintiffs' meritorious challenge and "Congress wanted to assure a single line of responsibility with regard to the education of handicapped children" (citation omitted)).

   [33]  20 U.S.C. § 1412(a)(11)(A) provides in pertinent part:

   The State educational agency is responsible for ensuring that--
   (i)  the requirements of this subchapter are met;
   (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency--
        (I)  are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
        (II) meet the educational standards of the State educational agency...

1  state intervention or monitoring; it does not present an interagency dispute among service

2  providers requiring supervisory resolution; nor does it present issues of reimbursement or

3  payment for which the state may be partially or wholly responsible.

4          Accordingly, the court will recommend dismissal of the California Department of

5  Education.

6          Dismissal of OAH is recommended on other grounds.  Both ALJ Johnson and the

7  Office of Administrative Hearings are immune from liability for the substance of the

8  administrative decision which, in any case, will be reconsidered on remand.  The doctrine of

9  judicial immunity protects administrative law judges in the performance of their judicial

10  functions.  Butz v. Economou, 438 U.S. 478, 513-14, 98 S.Ct. 2894, 2914 (1978).[34]  Judicial and

11  quasi-judicial immunity also extends to nonjurists "'who perform functions closely associated

12  with the judicial process.'"  In re Castillo, 297 F.3d 940, 948 (9th Cir. 2002), quoting Cleavinger

13  v. Saxner, 474 U.S. 193, 200, 106 S. Ct. 496 (1985).

14          Nor can liability be attached to the OAH for the incomplete transcript.  The record

15  does not demonstrate who, if anyone, may have been responsible for the recording error.  The

16

---

17     [34] "Judicial immunity discourages collateral attacks on final judgments through civil
suits, and thus promotes the use of 'appellate procedures as the standard system for correcting

18  judicial error . . . Most judicial mistakes or wrongs are open to correction through ordinary
mechanisms of review.' " In re Castillo, 297 F.3d 940, 947 (9th Cir. 2002), quoting Forrester v.

19  White, 484 U.S. 219, 225, 227, 108 S. Ct. 538 (1988). "This immunity applies '"however
erroneous the act may have been, and however injurious in its consequences it may have proved

20  to the plaintiff."' Cleavinger v. Saxner, 474 U.S. 193, 199-200, 106 S.Ct. 496, 500 (1985) [].
'Grave procedural errors or acts in excess of judicial authority do not deprive a judge of this

21  immunity.' Schucker v. Rockwood, 846 F.2d 1202, 1204 (9th Cir.), cert. denied, 488 U.S. 995,
109 S.Ct. 561(1988)." Moore v. Brewster, 96 F.3d 1240, 1244 (9th Cir. 1996). "Only two

22  exceptions apply–if the judge is acting clearly without jurisdiction or if the judge is not
performing a judicial act." Moore, 96 F.3d at 1243. "[T]he factors determining whether an act

23  by a judge is a 'judicial' one related to the nature of the act itself, i.e., whether it is a function
normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt

24  with the judge in his judicial capacity." Stump v. Sparkman, 435 U.S. 349, 362, 98 S.Ct. 1099,
1107 (1978). Judicial acts are those in which a judge is "perform[ing] the function of resolving

25  disputes between parties, or of authoritatively adjudicating private rights." Antoine v. Byers &
Anderson, Inc., 508 U.S. 429, 435-436, 113 S. Ct. 2167, 2171 (1993) (citation and internal

26  quotation marks omitted).  A judge is "subject to liability only when he has acted in the 'clear
absence of all jurisdiction.'" Stump, 435 U.S. at 356-7, quoting Bradley, 13 Wall. at 351.

1  transcripts of the hearing designate the "Reporter" as "Cassette," and does not otherwise indicate

2  the presence of a court reporter, courtroom clerk, or recording specialist.  The administrative law

3  judge later described the matter as an "unknown recording error" (Order Setting Conference, at

4  1) and "unknown recording failure" (Order re. Transcript, at 1).  In short, there is no evidence

5  upon which to conclude that responsibility for recording the hearing was outside the scope of

6  judicial or quasi-judicial immunity accorded to OAH's administrative judges and staff.  Even if it

7  were, the IDEIA neither creates nor recognizes any remedies against OAH or its officers other

8  than the opportunity for correction pursuant to a new hearing and the remand authority of this

9  court.

10        Accordingly, the court will recommend dismissal of the California Office of

11  Administrative Hearings.

12  <u>CONCLUSION</u>

13        This court's assessment has not been undertaken lightly.  The undersigned is

14  acutely aware of the passage of time – that more than a year has passed since the disputed

15  January 2006 IEP was presented – and that J.R.'s placement remains a crucial matter in his

16  education and development.  The court acknowledges plaintiffs' refrain that their disagreement

17  with the proposed IEP resulted in an adversarial situation in which they felt outnumbered by the

18  District and J.R.'s educators and service providers.  However, each child entitled to services

19  under the IDEIA presents unique circumstances including complicated academic, social and

20  behavioral issues, and his or her IEP team must necessarily be composed of the many experts

21  knowledgeable of that child's special needs.  Parents are uniquely situated to provide very

22  specific and helpful information about their child, and it is their responsibility to do so.  It is the

23  role of the administrative law judge to resolve disputes and render a decision that best meets the

24  needs of each individual child.  Parents are encouraged to trust in the system and the neutrality

25  and expertise of the administrative law judge and, on remand, to provide all information they

26  believe relevant to J.R.'s best interests.

1             For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

2             (1) the motion to dismiss  filed November 30, 2006, and renoticed June 22, 2007,

3  by Sylvan Union School District and Superintendent Dr. John Halverson (Docket Nos. 45 and

4  76), be GRANTED IN PART AND DENIED IN PART;

5             (2) the motion to dismiss filed November 30, 2006 by the California Department

6  of Education (Docket No. 44) BE GRANTED;

7             (3) the motion to dismiss filed December 1, 2006 by the California Office of

8  Administrative Hearings (Docket No. 47) BE GRANTED;

9             (4) the following parties and claims be DISMISSED from this action:

10    (a)  Dr. John Halverson, Superintendent of the Sylvan Union School District;

11    (b) The California Department of Education;

12    (c) The Office of Administrative Hearings;

13    (d) Counts IV, V, and VI, which allege claims pursuant to the Americans with

14    Disabilities Act, the Rehabilitation Act and the Unruh Civil Rights Act;

15    (e) Count II, which alleges systemic procedural violations by the California

16    Department of Education and Office of Administrative Hearings;

17    (f) Count VII, which seeks declaratory relief against the California Department of

18    Education and Office of Administrative Hearings; and

19    (g)  plaintiffs' general damages claim.

20           IT IS FURTHER RECOMMENDED that defendants' motions to dismiss should

21  be GRANTED IN PART AND DENIED IN PART with respect to plaintiffs' Count I, which

22  challenges procedural violations in the instant case and substantive review of the administrative

23  decision.  This case should be REMANDED to the administrative law judge with directions to

24  retry the third day of hearing (i.e., to obtain the testimony of Dr. Bonnie Santos, Mr. Donovan

25  Chapa, and Mr. James Merchant), including an opportunity for plaintiffs (without any

26  enlargement of time) to present any witnesses or evidence on their son's behalf, and for the ALJ

1   to issue a new decision.  The Clerk of Court should be directed to close this case, since any party

2   may timely appeal the new administrative decision subject to the considerations and parameters

3   set forth herein.

4            These findings and recommendations are submitted to the United States District

5   Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

6   after being served with these findings and recommendations, plaintiff may file written objections

7   with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

8   and Recommendations."  Plaintiff is advised that failure to file objections within the specified

9   time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153

10  (9th Cir. 1991).

11  DATED: 03/10/08                                    /s/ Gregory G. Hollows

12                                                     _____
                                                       GREGORY G. HOLLOWS
13                                                     UNITED STATES MAGISTRATE JUDGE

14  GGH5:Sylv2136.f&r.fin

15

16

17

18

19

20

21

22

23

24

25

26